FILED & ENTERED

MAY 07 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gooch    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>MICHAEL LEE HOBBS and<br>MICHELE ANNETTE HOBBS,<br><br>　　　　　　　　Debtors. | Case No.: 6:11-bk-19132-WJ<br><br>Chapter 13<br><br>**MEMORANDUM OF DECISION REGARDING (1) THE DEBTORS' MOTION TO MODIFY THEIR CHAPTER 13 PLAN AND (2) THE TRUSTEE'S MOTION TO DISMISS THIS CASE**<br><br>Hearings:<br>Date:　　February 28, 2012<br>Time:　　3:00 p.m.<br>Location: Courtroom 302<br><br>Date:　　November 17, 2011<br>Time:　　1:30 p.m.<br>Location: Courtroom 302 |

On November 17, 2011 and February 28, 2012, the Court held hearings regarding the "Motion under Local Bankruptcy Rule 3015-1(n) and (w) to Modify or Suspend Plan Payments" [docket #28] ("Modification Motion") filed on September 26, 2011 by Michael and Michele Hobbs ("Debtors") and the motion of the chapter 13 trustee, Rod Danielson ("Trustee"), to dismiss this chapter 13 case filed on January 3, 2012 [docket #35] ("Motion to Dismiss").[1]  All

---

[1] The Trustee later filed a second motion to dismiss [docket #55] which the Trustee later withdrew [docket #57]. The original Motion to Dismiss remains pending and is resolved by this decision.

appearances were noted on the record. The Trustee opposes the Modification Motion and the Debtors oppose the Motion to Dismiss.

Having considered both motions, the record in this case and the arguments of counsel at the hearings, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure,[2] as incorporated by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. JURISDICTION

Bankruptcy courts have jurisdiction over contested matters. See 28 U.S.C. §§ 157(b) and 1334(b). Both motions are core proceedings. See 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue is appropriate in this Court. See 28 U.S.C. § 1409(a).

## II. INTRODUCTION

The Debtors filed for chapter 13 relief on March 21, 2011. The Debtors proposed an amended sixty month plan with a monthly plan payment of $292 for the first two months and a payment of $377 per month for the remaining fifty-eight months. The amended plan provided for payment of 100% of allowed claims to general unsecured creditors. This Court confirmed the amended plan on May 4, 2011 pursuant to an order entered on May 6, 2011 [docket #17].

On September 26, 2011 – just over four months after confirmation of the plan – the Debtors filed the Modification Motion. The Modification Motion proposes to reduce monthly plan payments from $377 to $208 commencing September 2011 through the end of the plan term. The Modification Motion proposes to reduce the percentage paid to general unsecured creditors from 100% to 0%.

The deadline for creditors to file claims passed on August 2, 2011 and only six creditors filed claims. One is secured and the other five (claims 1, 3, 4, 5 and 6) assert unsecured claims

---

[2] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 and all "Rule" references are to the Federal Rules of Bankruptcy Procedure which make applicable certain Federal Rules of Civil Procedure.

totaling $9,009.28. Under the terms of the Modification Motion, the Debtors would use the $208 monthly plan payment to pay administrative claims and a secured debt arrearage (i.e. claim #2) but nothing would be paid to the unsecured creditors.

The Trustee filed opposition to the Modification Motion on October 12, 2011 [docket #31] and, again, on January 12, 2012 [docket #36]. The Trustee filed initial opposition arguing that the plan as proposed was not feasible[3] and that the Debtors could not afford the real property.[4] In his supplemental opposition, the Trustee also argues in greater detail that the proposed modified plan is simply not feasible.

For the reasons stated below, the Court concludes that the Debtors have failed to carry their burden of proving that the proposed modified plan is feasible. As a result, the Court shall enter a separate order denying the Modification Motion and granting the Motion to Dismiss.

### III. DISCUSSION

A.    <u>Modification of a Chapter 13 Plan</u>

A chapter 13 plan may be modified for a number of reasons, including to increase or decrease the amount of payments to a particular class of creditors provided for by the plan. 11 U.S.C. § 1329(a)(1). "[T]he only limits on modification are those set forth in the language of the Code itself, coupled with the bankruptcy judge's discretion and good judgment in reviewing the motion to modify." *In re Powers*, 202 B.R. 618, 622 (9th Cir. BAP 1996). When a debtor's actual income decreases post-confirmation, the debtor can move for plan modification to reduce the dollar amount of plan payments. *In re Kagenveama*, 541 F.3d 868, 875 (9th Cir. 2008).

The party proposing the modification has the burden of proving that there is an appropriate basis for modification, that the Code prerequisites are satisfied, and that the modification should be approved. *See In re Haas*, 76 B.R. 114, 116 (Bankr. S.D. Ohio 1987) (court refused to confirm modified plan because debtors, who moved for modification, did not

---

[3] Among other things, the Trustee asserts that $350 a month for food for two people and $50 a month for clothing for two people is not a feasible budget.

[4] The Trustee also asserts that the Debtors' mortgage and arrears payment equals approximately 50% of the Debtors' net income.

1 present a sufficient case for modification).  Modification of a confirmed plan involves,

2 essentially, a new plan confirmation, and the modified plan must comply with the statutory

3 requirements for confirmation of a plan.  *Max Recovery, Inc. v. Than* (*In re Than*), 215 B.R. 430,

4 434 (9th Cir. BAP 1997).  Under § 1329(b)(1), "the [confirmation] requirements of section

5 1325(a) of this title apply to any modification under subsection (a) of this section."

B. <u>An Overview of the Feasibility Requirement under § 1325(a)(6)</u>

The most pertinent provision of section 1325(a) in this case is section 1325(a)(6) which provides that a chapter 13 plan cannot be approved unless a debtor demonstrates that "the debtor will be able to make all payments under the plan and to comply with the plan . . . ."  In plain terms, the plan proposed by a debtor must be feasible.  A court cannot confirm a chapter 13 plan unless the debtor demonstrates the debtor will be able to make the payments required by the plan.  In most cases, this means timely making sixty monthly plan payments to the trustee over the five year duration of the proposed plan and simultaneously timely making all monthly secured debt payments (typically the mortgage on a residence) during the same five year period.

The idea that a plan should not be confirmed unless it is feasible makes sense.  The statutory requirement reflects a reasonable policy objective to attempt to limit chapter 13 cases to instances in which a debtor can perform under the terms of the proposed plan.  Chapter 13 cases are considerably more expensive than chapter 7 cases for debtors[5] and they also impose additional costs for creditors, the courts and the trustees.  Obviously, perfection is not required but the statute specifically requires a debtor to demonstrate an ability to make "all payments under the plan."  Failure to do so precludes confirmation.

While the statute presents a simple and concise standard, implementation of section 1325(a)(6) has not been nearly as neat and tidy.  To the contrary, the chapter 13 process

---

[5] Katherine Porter, "The Pretend Solution: An Empirical Study of Bankruptcy Outcomes", 90 <u>Texas Law Review</u> 103, 107-108 (November 2011) ("The sting of the Chapter 13 critique was compounded by a cost comparison. Not only did Chapter 13 deliver little protection to most of those who turned to it for help, but the complexity of Chapter 13 meant that the attorney's fees were significantly higher than for Chapter 7.  The difference has persisted over time.  In 2007, the median cost of a Chapter 13 bankruptcy was $2,500, 250% higher than the cost of a Chapter 7 case.").

(as a statistical matter) has largely failed. Nationwide, only one-third of chapter 13 plans succeed.[6] Only one in three debtors nationwide actually makes all the required plan payments which means that two-thirds (67%) of chapter 13 cases fail nationwide.[7] This rate of failure has "persisted for more than thirty years" and has led one professor to refer to chapter 13 as the "pretend solution . . . a social program that does not work as intended but is not critiqued or reformed because its flaws are hidden."[8]

In the Central District of California, however, the data is even more discouraging. According to data from a former chief bankruptcy judge, a review of the Court's records a few years ago indicated that only 3% of chapter 13 cases in this district resulted in a completed plan with chapter 13 debtors making all plan payments. In 97% of the chapter 13 cases, debtors fail to make all payments required under the plans that they propose.

In this division - the Riverside Division of the Central District of California - the failure rate is not quite as high but still far above the national average. The chapter 13 standing trustee has calculated that 92% of all chapter 13 cases fail (i.e., fail to result in a confirmed and fully performed chapter 13 plan). The failure rate of 92% rises to nearly 100% for chapter 13 cases in which the debtor is not represented by an attorney. In other words, nearly every case filed by a chapter 13 debtor who does not have an attorney fails given the many requirements necessary to successfully complete a chapter 13 case.

According to the Court's own records, approximately 44% of all chapter 13 cases in this division of this district are filed in pro per and nearly 100% of these cases fail. Debtors who file the other 56% of chapter 13 cases are represented by counsel but those cases fail at the rate of approximately 86%. In other words, only 14% of chapter 13 cases involving attorneys succeed and virtually 0% of chapter 13 cases filed by unrepresented debtors succeed. Overall, 92% of all chapter 13 cases in this division of this district fail. Thus, while nationwide about two-thirds

---

[6] Id. at 107 ("Their most controversial finding was that only one in three cases filed under Chapter 13 ended in a completed payment plan").

[7] Id. at 113.

[8] Id.

- 5 -

1  (67%) of all chapter 13 cases fail, in this division, the failure rate is twenty-five percentage points
2  higher at 92%.

3    As with any complicated subject, the failures of chapter 13 cannot be pinned to one factor
4  alone. It is a complex subject. But clearly one aspect of the problem is the failure to apply
5  section 1325(a)(6).

6    There is a temptation to confirm plans by ignoring section 1325(a)(6) or giving it little
7  attention. Attorneys, trustees and judges are sometimes susceptible to ignoring feasibility
8  requirements especially in instances (unlike this one) in which no opposition to confirmation
9  exists. Counsel for a chapter 13 debtor bears the initial responsibility for screening cases and
10  insuring that a chapter 13 debtor can actually perform under the terms of a plan and satisfy
11  section 1325(a)(6). Trustees and courts must also review each case and the requirements of
12  section 1325(a)(6). Failure to follow the statute not only runs afoul of the requirements imposed
13  by Congress, but lead to considerable waste of resources of the parties and the courts.

14    For example, in a previous case (unrelated to this one) counsel for the debtor (who is not
15  involved in this case) sought to obtain confirmation of a questionable chapter 13 plan which
16  appeared to be infeasible and admitted during oral argument that he had practiced chapter 13 for
17  so long that he had given up "a long time ago" trying to figure out "who is going to make it and
18  who isn't".[9] But section 1325(a)(6) specifically requires that counsel, the trustee and the court
19  engage in exactly this inquiry. And while it may be tempting to simply ignore
20  section 1325(a)(6), the section precludes confirmation unless a debtor provides evidence of an
21  ability to succeed in making plan payments. Indeed, in the case quoted from above, the
22  chapter 13 plan did fail quite quickly.

23    With these concepts in mind, the Court is unable to conclude in this case that the Debtors
24  have provided sufficient evidence to satisfy section 1325(a)(6).

---

[9] In re Lavaro and Teresa Taylor, Case No. 6:11-bk-25512-WJ, Transcript of Hearing on June 29, 2011 [Docket #28], page 6, lines 18-20.

- 6 -

1  C. <u>The Feasibility Requirement As Applied In This Case</u>

2  As discussed above, the court cannot confirm (or modify) a chapter 13 plan unless it finds
3  that the debtor will be able to make all the proposed payments and to comply with the plan. The
4  plan must be feasible. 11 U.S.C. § 1325(a)(6). The debtor must have both the present and future
5  ability to make the proposed payments. *In re Street*, 17 B.R. 787, 788 (Bankr. N.D. Ill. 1982);
6  *see also In re Pellegrino*, 423 B.R. 586, 591 (1st Cir. BAP 2010) (chapter 13 case dismissed
7  where below-median income debtors had insufficient income over minimum commitment period
8  to make plan payments).

10  <u>1. The Debtors Have Not Demonstrated Post-Petition Performance.</u>

11  Courts consider several factors when deciding whether the debtor will be able to perform
12  under the plan. One is the debtor's post-petition performance. Courts are more inclined to find a
13  plan feasible where the debtor has been making all payments required under the plan since the
14  case was filed. *See In re Govan*, 139 B.R. 1017, 1021 (Bankr. N.D. Ala. 1992) (debtor who had
15  made all payments to trustee and mortgagee since petition was filed demonstrated willingness
16  and ability to fully comply with proposed plan); *In re Wilson*, 117 B.R. 714, 714–15 (Bankr.
17  M.D. Fla. 1990) (plan not feasible because debtor was not current with plan payments and
18  debtor's budget showed a monthly deficit).

19  The Debtors have not satisfied this standard. In order to ascertain whether the Debtors
20  are post-petition current in making their mortgage payments, the Court directed the Debtors to
21  provide a declaration demonstrating proof of the post-petition payments. The minute order was
22  entered on November 17, 2011 and it set the briefing schedule for the continued hearing on
23  February 28, 2012. That order directed the Debtors to provide a declaration with proof of the
24  post-petition mortgage payments. The deadline for doing so was seven to fourteen days prior to
25  the February 28th hearing but the Debtors did not provide that information. No declaration was
26  ever provided in response to the minute order. Thus, the Debtors have not demonstrated that
27  they have made any post-petition mortgage payments since the confirmation of the original plan.

- 7 -

The absence of evidence is particularly problematic in a case (such as this one) in which the Debtors propose to pay 50% of their income to pay their current home mortgage and the arrears. By historic and current standards, that level of expense is very high. The vast majority of households simply cannot afford to devote that high a percentage of income to housing expenses.

With respect to the plan payments, the Trustee has provided information indicating that the Debtors have struggled to make their plan payments timely. The Trustee contends that all plan payments (with one exception) have been late. Thus, the Debtors have not demonstrated by post-petition performance that the plan is feasible.

### 2. The Debtors' Budget Is Not Realistic.

Another factor courts consider in determining the feasibility of a plan is whether the debtor has a realistic budget. A plan predicated upon unrealistically low expenses or an inadequate "cushion" between income and expenses is not feasible. *See In re Lucas*, 3 B.R. 252, 254 (Bankr. S.D. Cal. 1980) (where debtor was sole source of support for herself and three young children, and her net monthly income was $893, plan proposing to pay $90/month to creditor for 30 months was not feasible).

Here, the Debtors' budget is extremely lean. At the outset of the case, the mother of one of the Debtors lived with the Debtors and she contributed $969 per month in income to the Debtors. Sadly, last summer she passed away and the Debtors lost that income of $969 per month.

In response, the Debtors have filed new Schedules I and J which reduces income by $969 and expenses by $800.[10] Unfortunately, the Debtors have not provided any evidence at all in support of the new budget. The new budget drastically reduces various line items but the

---

[10] The Trustee notes that the amended Schedule J compared to the Schedule J at the time of confirmation shows an $880 reduction in expenses but since the plan payment was increased by $80 from the monthly net income amount stated on the Debtors' Schedule J at the time of confirmation, the actual decrease in expenses since confirmation is only $800.

- 8 -

Debtors have not provided any evidence to demonstrate that the changes are reasonable or realistic.

In response, the Trustee has raised a variety of objections to the Debtors' new budget. Examples of some of the reduced expenses are as follows: a reduction in electricity from $195 to $120; food decreased from $750 to $350; and contingencies decreased from $100 to $50, as did personal care. Considering the National Standard as of the date of the Debtors' bankruptcy filing for food expense was $300 per person, a monthly food budget for two people of $350 seems unrealistically lean. In addition, the National Standard for apparel and services is $162 for two people, while the Debtors' budget has only listed $90 for clothing, laundry and dry cleaning. Finally, the National Standard provides for a monthly miscellaneous expense of $165 for two people, while the Debtors have scheduled contingencies of $50. A realistic review of the Debtors' budget shows that it is not feasible.

The Debtors have not provided any evidence to explain the variances between the National Standards and their own figures. Indeed, the Debtors have not provided any evidence to demonstrate that their new proposed budget is realistic. Without evidence, the Court simply cannot approve the new plan and it is undisputed that the Debtors bear the burden of providing evidence to support confirmation of their plan.

The Court cannot approve the modified plan given the lack of any evidence in support of the proposed expenditures in the new budget.

### 3. The Drastic Decrease Is Also Problematic.

Another factor that weighs against approval of the plan is the drastic reduction in the proposed payment to general unsecured creditors. Reducing the plan from 100% to 0% is a red flag of infeasibility. If the Debtors had reduced their payments to general unsecured creditors from 85% to 65% or 22% to 17%, the modification of the plan might appear to be more plausible (especially in circumstances such as this case when the debtor does not provide evidence in support of the new budget). Slight changes in the percentage paid to unsecured creditors raise less of a concern regarding feasibility. But a change of 100% (literally) in the amount paid to

- 9 -

1  general unsecured creditors is, obviously, the largest change possible and it is under these

2  circumstances that the feasibility concerns are greatest.

### 4. The Decrease To Zero Percent Is Also Problematic.

Finally, while the large change (from 100% to 0%) in the payments to general unsecured creditors is problematic in and of itself, the reduction to 0% raises a separate independent concern regarding feasibility. Why did the Debtors reduce their proposed payments to 0% as opposed to 15% or 10% or 5% or even 2%? In doing so, the Debtors are, again, raising a red flag of feasibility. In other words, even if they had started at 60% or 50% or 40% (instead of 100%) and then reduced their plan payments to 0%, feasibility concerns would exist. It is not simply that they reduced their percentage from 100% to 0% but that they now propose 0% to general unsecured creditors instead of 15% or 10% or 5% or 2%.

The math of this case illustrates this red flag rather starkly. Under the terms of their proposed amended plan, the Debtors propose to make monthly plan payments of $208. But they only have $9,009.28 in general unsecured claims. Therefore, if they increased their plan payment by just $37 per month (i.e. from $208 to $245), they could pay 25% to their general unsecured creditors. Or, if they paid just $15 more per month (i.e. $223 instead of $208), they could pay 10% to their general unsecured creditors. Likewise, for each additional increment of a 10% dividend to unsecured creditors, the Debtors would need to pay only an additional $15 per month. This data demonstrates that even very slight changes in budgeting can have a huge impact on the general unsecured creditors in the case.

According to Schedule J, the Debtors have expenses of $2,700 per month. As discussed above, the Debtors have not provided evidence in support of the individual line items on Schedule J. Under the facts of this case, the Debtors are asking the Court to conclude that their plan is feasible with expenses of $2,700 but not feasible at $2,685 (if they paid $15 per month to general unsecured creditors) and not feasible at $2,663 (if they paid $37 per month to general unsecured creditors). Without evidence from the Debtors, the Court simply cannot make this determination.

### 5. Conclusion.

For the four reasons stated above, the Court finds that the Debtors have not carried their burden of proving feasibility under section 1325(a)(6). Of the four reasons discussed above, the failure to provide proof of the post-petition mortgage payments and the failure to provide evidence in support of the line items on the new budget are the most significant factors.

### D. Failure to Comply with a Court Order

Finally, the Court denies the Modification Motion for a second independent reason: failure to obey a court order. After the November 17, 2011 hearing, this Court issued a minute order, continuing the matter to February 28, 2012 at 3:00 p.m. and ordering the Debtors to "timely (1) file and serve the 'Declaration Of Debtors Regarding Secured Debt Payment History' between seven to fourteen days prior to the next hearing. . .(2) attached to the declaration copies of all post-petition payments…and (3) comply with all provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures and all local bankruptcy rules. Failure to obey this court order may result in the dismissal of the case with or without a bar to re-filing pursuant to 11 U.S.C. § 109(g) and other applicable law." The Debtors did not timely file and serve a Declaration Of Debtors Regarding Secured Debt Payment History and therefore failed to comply with the Court's order.

A court may dismiss an action, with or without prejudice, based on a party's failure to prosecute an action, failure to obey a court order, or failure to comply with local rules. *See, e.g., Ghazali v. Moran,* 46 F.3d 52, 53-54 (9th Cir.1995) (dismissal for noncompliance with local rule); *Ferdik v. Bonzelet,* 963 F.2d 1258, 1260-61 (9th Cir.1992) (dismissal for failure to comply with an order requiring amendment of complaint); *Carey v. King,* 856 F.2d 1439, 1440-41 (9th Cir.1988) (dismissal for failure to comply with local rule requiring pro se plaintiffs to keep court apprised of address); *Malone v. United States Postal Serv.,* 833 F.2d 128, 130 (9th Cir.1987) (dismissal for failure to comply with court order); *Henderson v. Duncan,* 779 F.2d 1421, 1424 (9th Cir.1986) (dismissal for lack of prosecution and failure to comply with local rules).

1  Here, providing evidence of timely post-petition payments is a component of determining
2  feasibility.  That evidence is crucial.  Therefore, the failure to provide that evidence warrants
3  dismissal of the case.

### IV.  CONCLUSION

Chapter 13 presents a multitude of issues and challenges for courts.  Distinguishing between the viable chapter 13 cases from the nonviable is sometimes quite easy but, at other times, very difficult.  It can also be difficult in cases (such as this one) that are impacted by tragedy and the presence of sympathetic debtors.  But in all cases, debtors must provide evidence to support confirmation.  Without evidence, courts are tempted to simply ignore section 1325(a)(6) which is a prerogative the law does not permit.

Accordingly, for the reasons stated, the Modification Motion is denied and the Motion to Dismiss is granted.  A separate order shall be entered.

###

DATED: May 7, 2012

_Wayne Johnson_
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **MEMORANDUM OF DECISION REGARDING (1) THE DEBTORS' MOTION TO MODIFY THEIR CHAPTER 13 PLAN AND (2) THE TRUSTEE'S MOTION TO DISMISS THIS CASE** was entered on the date indicated as Entered on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. The following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Barry E Borowitz    notices@blclaw.com, ecf@blclaw.com;borowitzclark1@gmail.com
- Michael E Clark    notices@blclaw.com, ecf@blclaw.com;borowitzclark1@gmail.com
- Nancy B Clark    notices@blclaw.com, ecf@blclaw.com;borowitzclark1@gmail.com
- Rod (WJ) Danielson (TR)    notice-efile@rodan13.com
- United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

Michael Lee Hobbs
25398 El Greco Drive
Moreno Valley, CA 92553

☐ Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an Entered stamp, the party lodging the judgment or order will serve a complete copy bearing an Entered stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☐ Service information continued on attached page

**ADDITIONAL SERVICE INFORMATION** (if needed):